# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA AT HUNTINGTON

DUSTIN ELSWICK, individually,

    Plaintiff,

vs.   Civil Action No. : 3:21-cv-00468

BRIAN D. HALL, individually,
XERXES RAHMATI, individually,
SCOTT A. LOWTHER, individually,
BRIAN LOCKHART, individually,
PUTNAM COUNTY COMMISSION,
a political subdivision of the State of West
Virginia, JOHN DOE, an individual,

    Defendants.

## COMPLAINT

This complaint, brought pursuant to 42 U.S.C. Section 1983, and the Fourth Amendment to the United States Constitution, arises out of the unlawful and unreasonable search and seizure occurring at the Plaintiff's home on August 21, 2019 in Putnam County, West Virginia, within the Southern District of West Virginia, Huntington Division.

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. 1331 and 1343.

## PARTIES

1.    Plaintiff Dustin Elswick was at all times relevant hereto a resident of Putnam County, West Virginia.

2.    Defendant Brian D. Hall is and was at all times relevant hereto a resident of Putnam County, West Virginia, with an address of 236 Courthouse Drive, Suite 8,

Winfield, West Virginia 25213 and is employed by the Putnam County Sheriff's Department. He is named in his individual capacity.

3. Defendant Xerxes Rahmati is and was at all times relevant hereto a resident of Putnam County, West Virginia, with an address of 236 Courthouse Drive, Suite 8, Winfield, West Virginia 25213 and is employed by the Putnam County Sheriff's Department. He is named in his individual capacity.

4. Defendant Scott A. Lowther is and was at all times relevant hereto a resident of Putnam County, West Virginia, with an address of 236 Courthouse Drive, Suite 8, Winfield, West Virginia 25213 and is employed by the Putnam County Sheriff's Department. He is named in his individual capacity.

5. Defendant Brian Lockhart is and was at all times relevant hereto a resident of Putnam County, West Virginia, with an address of 236 Courthouse Drive, Suite 8, Winfield, West Virginia 25213 and is employed by the Putnam County Sheriff's Department. He is named in his individual capacity.

6. Defendant Putnam County Commission ("PCC") is a political subdivision of the State of West Virginia. *See* West Virginia Governmental Tort Claims and Insurance Reform Act, W. Va. Code § 29-12A-1, *et seq*.

7. Defendant John Doe is named herein in his official capacity. His identity is currently unknown. He is the supervisor of the defendant police officers. He is a sworn law enforcement officer for the Putnam County Sheriff's Department. He is named in his individual capacity.

## **FACTS**

8. On August 21, 2019, the defendant police officers named herein arrived at the residence of Plaintiff Dustin Elswick, which was located in a rural portion of Putnam County, West Virginia, down a long private driveway which was blocked by a private gate.

9. The defendant police officers, Hall, Rahmati, Lowther and Lockhart, were all sworn law enforcement officers employed by the Putnam County Sheriff's Department. They arrived in two unmarked police cruisers. They entered the Plaintiff's property under color of law.

10. The defendant police officers entered the Plaintiff's property under the auspices of serving a civil summons on the Plaintiff pertaining to a civil dispute which had been filed in the Magistrate Court of Putnam County.[1] However, none of the officers were tasked with civil service duties for the sheriff's department. Rather, they were members of an inter-county drug task force, the Special Enforcement Unit ("SEU"). For some unknown reason, they believed that there were illegal drugs or other contraband inside the Plaintiff's residence.[2] However, they had no probable cause, nor a warrant, to enter or search the residence. Nevertheless, the said officers entered the home and performed a search therein.

---

[1] Plaintiff's landlord filed an eviction complaint against Plaintiff due to alleged nonpayment of rent. Given that the Plaintiff had not yet been served with the summons and copy of the complaint, there was no eviction order. There had therefore been no response yet by the Plaintiff, nor a hearing held before the magistrate. The dispute between the Plaintiff and his landlord was subsequently resolved between them and the eviction complaint was voluntarily withdrawn by the landlord.

[2] No drugs were found inside Plaintiff's residence. It is unknown on what basis the defendant police officers believed they would find illegal drugs inside the Plaintiff's home.

11.     From outside the Plaintiff's home, the defendant police officers pushed a window mounted air conditioner unit through the window and into the interior of the residence of the Plaintiff's home. The defendant police officers then climbed into the residence through the window, now accessible due to the fact that the air conditioner was now missing.

12.     The defendant police officers were then recorded on Plaintiff's hidden interior security cameras beginning at approximately 11:17 A.M. Defendants were captured on video with their flashlights out, searching the interior of the Plaintiff's residence. In the process of searching, the officers looked through the Plaintiff's clothing, his dresser drawers, moved his bed sheets around, opened a chest at the foot of his bed, leaving it open thereafter and otherwise leaving the bedroom in a state of disarray following the search.

13.     The defendant police officers found the cremated remains of a deceased friend of the plaintiff. An officer can be seen shaking it, smelling it and otherwise examining the container holding the remains. The defendant police officers then took the remains outside the house and field-tested them for narcotics. The defendant police officers then left the remains downstairs on a shelf above the kitchen sink. They discarded two used drug field test kits containing small samples of the human remains, where Plaintiff found them on the ground outside his home upon returning later in the day. Small bits of bone could still be seen in the used test kits.

14.     During their search of the residence, the defendant police officers removed the Plaintiff's lawfully owned and possessed firearms out of storage from inside the closets of his residence. They arranged the firearms for display purposes,

laying them out inside the residence, photographing and examining them. They never returned the firearms to where they found them, leaving them on display for the Plaintiff to find upon returning home.

15. While on the property; the defendant police officers disabled and destroyed an exterior surveillance camera attached to the residence that would have captured their presence outside the Plaintiff's home. However, they missed one camera, which captured the arrival and departure of the police cruisers, as well as Defendant Lowther standing guard outside the house while it was being searched. Lowther can be observed wearing a tactical vest marked "SHERIFF." The surviving exterior footage also shows that the officers arrived and departed in unmarked police cruisers.

16. An acquaintance called the Plaintiff after driving past his residence and noticing police cruisers at Plaintiff's residence.

17. After receiving the phone call from the acquaintance,[3] Plaintiff called his mother, who arrived at Plaintiff's residence shortly thereafter with her friend, in order to ascertain the purpose of the law enforcement presence at the home.

18. Upon her arrival at the residence the driveway gate was open, indicating that the officers had opened the gate before entering.

19. When Plaintiff's mother reached the end of the driveway and exited her vehicle, the defendant officers confronted her and prevented her from getting closer to the house.

20. The defendant officers asked Plaintiff's mother her identity and purpose.

---

[3] The acquaintance was the aunt of Plaintiff's supervisor at his place of employment.

21. The defendant officers detained Plaintiff's mother and ran her criminal history through dispatch, as well as her vehicle tags, ultimately detaining her, along with her friend, for approximately 30 to 40 minutes until the officers left the property at the end of the search and seizure.

22. At one point during the detainment, the officers told the Plaintiff's mother that they were present to serve civil process paperwork on the Plaintiff. They instructed her to call Plaintiff on the phone, which she did. Once on the phone, Plaintiff talked to Defendant Hall regarding the civil process paperwork and was told that the process would be given to his mother, which it was. Neither Hall, nor any other officer that day, mentioned the fact that they were searching Plaintiff's residence. Nor did they ask about illegal drugs or allegations of contraband inside Plaintiff's home.

23. During the time Plaintiff's mother was on the property and detained by the defendant officers, she was kept at a distance and prevented from observing the home while the search was occurring.

24. The officers said nothing to the Plaintiff's mother, nor to the Plaintiff on the telephone, regarding their having a search warrant. Upon information and belief, they did not have a search warrant, nor any criminal process pertaining to the Plaintiff. Rather, the defendant officers possessed civil process paperwork from the Magistrate Court of Putnam County to serve on the Plaintiff.

25. Plaintiff finally arrived home after the defendant officers left the property. Upon returning home, it was immediately visible to Plaintiff that the officers had entered and searched his home. He observed the window air conditioner attachment which had been pushed into the home, leaving the window open. He observed disarray inside.

26. Inside the home, Plaintiff observed that the house appeared to have been ransacked; that his firearms were all taken out of storage and laying out in the open. He observed numerous items either missing or out of place, including his friend's cremated remains, along with two used drug test kits in the yard.

27. Plaintiff accessed his hidden interior surveillance camera footage, which showed that the officers had entered his home and searched his home. A Freedom of Information Act request subsequently sent by counsel to the Putnam County Sheriff's Office revealed that they were in possession of no documentation evidencing an explanation for the officers having entered and searched the Plaintiff's residence on August 21, 2019. According to the defendant officers' employer, there was no search warrant, no police report, no documentation that the officers had ever entered onto Plaintiff's property that day.

28. After making the video footage public, Plaintiff discovered that the same group of police officers, acting as the SEU, had victimized other individuals in a similar manner, including the Johnson family, who are plaintiffs in the now-pending case against the defendants, in civil action no. 3:21-cv-00242, as well as Mason Dillon, who is a plaintiff in the now-pending case against the defendants, in civil action no. 3:21-cv-00435.

29. Upon information and belief, the SEU would obtain tips about individuals who may be in possession of marijuana, or who may be selling marijuana. They would then make warrantless entry into the residence of the suspected individual in possession of marijuana, or other suspected illegal drugs. Upon finding the marijuana that was the subject of the tip, the SEU would then threaten and pressure the suspect to

give them another tip, or to identify another individual who was in possession of marijuana, in exchange for not being arrested or charged. The SEU members would then leave, taking the marijuana they seized, along with any cash money or firearms they located in their illegal search and seizure. The SEU would then repeat the process at the new target residence. They would leave no paper trail, such as police reports, warrant applications, charging documents, search and seizure inventory, etc. The seized marijuana, cash money, and even firearms seized, would thereafter disappear into the possession of the SEU members without ever being properly documented.

### COUNT ONE - UNREASONABLE SEARCH AND SEIZURE IN VIOLATION OF THE FOURTH AMENDMENT

30. Plaintiff incorporates by reference all of the previous paragraphs.

31. On August 21, 2019, the defendant police officers forcibly entered the residence of the Plaintiff, by pushing in a window mounted air conditioning unit and climbing through the window, for the purposes of searching the interior of the Plaintiff's residence.

32. Once inside the Plaintiff's residence, the defendant police officers performed a search of the interior of the residence, as described above in detail. They performed the search for the purpose of locating contraband inside the home, which they intended to utilize to thereafter obtain criminal charges against the Plaintiff. However, they found no contraband in the residence since there was no contraband present in the residence.

33. The defendant officers committed the said search and seizure inside the Plaintiff's residence in the absence of a search warrant. Nor did they have an arrest warrant. Plaintiff's Freedom of Information Act request to the Putnam County Sheriff's

Office revealed that the defendant officers' employer possessed no documentation of the existence of criminal charges, or even an investigation, against the Plaintiff pertaining to allegations or suspicions of criminal behavior.

34. The defendant officers possessed no justification to perform a warrantless search of the Plaintiff's home on August 21, 2019. There is no indication that any sort of exigency occurred in the Plaintiff's home on said date which would form the basis of a claim of exigent circumstances. The home was unoccupied at the time, and Plaintiff was at work during the search. The officers were aware that the home was unoccupied and that Plaintiff was at work, given the fact that they called Plaintiff's employer in advance of their arrival, presumably to ensure that he would not be home.

35. Likewise, Plaintiff was not home during the search in order to consent to the entry and search of his home. Plaintiff was entirely unaware that officers had searched his home until he returned home and observed the damage and surveillance footage. Therefore consent could not justify the warrantless search and seizure.[4]

36. No objectively reasonable police officer would believe that they possessed legal justification or authority to enter and search the Plaintiff's home, as described above, without a warrant and without consent or the presence of exigent circumstances justifying entry, for the purposes of searching the home for contraband.

37. Instead of acting objectively reasonable, the defendant officers were engaging in a pattern and practice of performing warrantless and unjustified searches and seizures, as described above, and as documented as having occurred in civil action

---

[4] Nor could Plaintiff's landlord consent to the defendant officers searching his home. See Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961).

nos. 3:21-cv-00242 and 3:21-cv-00435, pending in the Southern District of West Virginia.

38. The defendants' actions as alleged herein were performed under color of law, objectively unreasonable, willful, wanton, intentional and done with a callous and reckless disregard for the plaintiffs' Fourth Amendment rights to be free from unreasonable search and seizure. The defendant officers are not entitled to qualified immunity.

39. Plaintiff suffered damages and is entitled to recover for the same.

## COUNT TWO - MONELL CLAIM

40. Plaintiff incorporates by reference all of the previous paragraphs.

41. The PCC, through the establishment and operation of the Special Enforcement Unit, or SEU, adopted and implemented an official policy, custom and practice of violating the rights of homeowners in Putnam County, West Virginia. The SEU engaged and a pattern and practice of warrantless searches and seizures under the auspices of fighting against illegal drug use and crime. They wore no law enforcement uniforms and generally gave the appearance that they were acting outside of the law, with no documentation, no warrants, and no paperwork in most cases. They used intimidation and a perceived lawlessness to more effectively and efficiently acquire information and sources. However, they were acting under color of law and with the approval of their supervisors and the PCC.

42. Defendants Hall, Rahmati, Lowther and Lockhart, acted in furtherance of that said official policy, custom and practice when they deprived the Plaintiff of his Fourth Amendment rights on August 21, 2019, as described herein. They performed a

warrantless entry into Plaintiff's home and searched and seized therein, ultimately leaving no paper trail of their civil rights violations against the Plaintiff. In so acting, the said defendants were employed by the PCC and acting under color of law.

43. The said defendants have also committed other similar civil rights violations against other victims in Putnam County, West Virginia, including civil action nos. 3:21-cv-00242 and 3:21-cv-00435, pending in the Southern District of West Virginia, both having occurred prior to the search of the Plaintiff's home.[5] In so acting, the said defendants were employed by the PCC and acting under color of law.

44. The SEU was created by the PCC to engage in unorthodox and aggressive investigation and enforcement of drug laws, which the PCC featured to the local TV news media in a ride-a-long segment which featured the SEU in action. Upon information and belief, the SEU was created for the very purpose of creating and executing a pattern, practice and policy of carrying out warrantless searches and seizures, designed to have the effect of creating fear in drug users and drug sellers, so as to cause them to cooperate. However, innocent individuals ended up being targeted and having their constitutional rights violated by the SEU, including the search and seizure of the Plaintiff's home on August 21, 2019.

45. As a direct and proximate result of the said policy, custom and practice, the plaintiffs were damaged, for which they are entitled to recover.

**COUNT THREE - SUPERVISORY LIABILITY**

46. Plaintiff incorporates by reference all of the previous paragraphs.

---

[5] Upon information and belief, Defendant Lockhart was not involved in the said prior incidents. Instead, a former Deputy, Kenny Davis, was involved in those incidents.

47.　　Supervisor of the defendant police officers - the SEU - had actual knowledge that his subordinates were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to the Plaintiff; namely that they were going to be searching the Plaintiff's residence and seizing the Plaintiff's property, without a search warrant, or applicable exception to obtaining a search warrant, as described in the above paragraphs in detail.

48.　　Supervisor of the defendant police officers was aware that the SEU was created for the express purpose of violating the constitutional rights of individuals who they perceived to be involved in illegal drug use or sale. In addition to being unconstitutional on its face, the said policy also threatened to victimize innocent individuals, such as the Plaintiff, who would be subject to search and seizure on the basis of a hunch, or misinformation, wholly in the absence of probable cause.

49.　　The said supervisors' response to that knowledge was so inadequate as to show deliberate indifference to, or tacit authorization of, the aforesaid conduct.

50.　　As a direct and proximate result of the said supervisors' inaction, the plaintiffs suffered constitutional violations and were damaged, for which they are entitled to recover.

**PRAYER**

WHEREFORE, based on the above stated facts, the Plaintiff respectfully requests that this Honorable Court award:

1.　　Damages against the defendants in an amount to be determined at trial which will fairly and reasonably compensate the Plaintiff for all compensatory damages to be proven at trial;

2.　　Punitive damages against the individual defendants in an amount to be determined at trial; and

3.　　Reasonable attorney fees and costs pursuant to 42 U.S.C. 1988.

**PLAINTIFF DEMANDS A TRIAL BY JURY**

　　　　　　　　　　　　　　　　　　DUSTIN ELSWICK,
　　　　　　　　　　　　　　　　　　By Counsel

/s John H. Bryan
John H. Bryan (WV Bar No. 10259)
JOHN H. BRYAN, ATTORNEY AT LAW
411 Main Street
P.O. Box 366
Union, WV 24983
(304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com